IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KENNETH P. ALMES,                    )
                                     )
        Plaintiff,                   )
                                     )
        vs.                          )   Civil Action No. 08-1662
                                     )
MICHAEL J. ASTRUE,                   )
Commissioner of Social Security,     )
                                     )
        Defendant.                   )

## MEMORANDUM OPINION

## I.    INTRODUCTION

Pending before the Court are cross-motions for summary
judgment filed by Plaintiff Kenneth P. Almes and Defendant Michael
J. Astrue, Commissioner of Social Security. Plaintiff seeks review
of a final decision by the Commissioner denying his claim for
disability insurance benefits ("DIB") under Title II of the Social
Security Act, 42 U.S.C. §§ 401 *et seq.* For the reasons discussed
below, Defendant's motion is denied and Plaintiff's motion is
granted insofar as he seeks remand for reconsideration.

## II.   BACKGROUND

### A.    Factual Background

Plaintiff Kenneth Almes was born on September 4, 1948,
and graduated from college with a bachelor's degree in political
science and liberal arts in 1970. (Certified Copy of Transcript of
Proceedings before the Social Security Administration, Docket No.
4, "Tr.," at 43-44, 121.)    He then went to work for the

Commonwealth of Pennsylvania Department of Transportation and in January 1985 became a caseworker for the Commonwealth Department of Public Welfare. (Tr. 47, 57, 126.) Plaintiff reported he had always had a "natural impairment" of working slowly, and fell behind in his work due to absenteeism associated with colds, flu, and chronic diarrhea attributed by his physicians to irritable bowel syndrome ("IBS.") (Tr. 57, 135.) He also developed arthritis in the fingers of both hands which affected his ability to write and type. (Tr. 136, 140.) Despite these problems, he was able to maintain his employment with the state.

In January 2003, Mr. Almes had polyps removed from his bowel and soon thereafter began treating with Dr. Eric Heasley, a general practitioner, for the symptoms of IBS, high cholesterol, obesity and diabetes mellitus. (Tr. 185.) In August 2003, Plaintiff told Dr. Heasley that his psychotherapist had suggested that he receive medication for his long-standing depression and anxiety. (Tr. 184.) In October, after an episode in which Mr. Almes reported that he had been off work for the previous three days due to psychological problems, Dr. Heasley "strongly suggested" that he consult a psychiatrist. (Tr. 182.)

In December 2003, Plaintiff consulted with Dr. Daniel R. Kelleher at Neuropsychiatric Associates, Inc., in Indiana, Pennsylvania. Mr. Almes told Dr. Kelleher that things had not been going well at his office; he had increasing difficulty in

2

completing his caseload, and was alleged to have been "falsifying records." (Tr. 210.) Dr. Kelleher diagnosed Mr. Almes with major depression and adjusted his medications. (Tr. 211.)

On January 7, 2004, Mr. Almes quit his job with the Department of Public Welfare because of difficulties keeping up with his work. (Tr. 117.)

## B. Procedural Background

Plaintiff applied for a period of disability and disability insurance benefits on February 16, 2005, claiming he was unable to work due to depression, chronic diarrhea, obesity and arthritis. (Tr. 116.) His application was denied at the state agency level on July 12, 2005, the examiner having concluded that although Plaintiff could not perform his past work as a income maintenance caseworker, there were other less mentally demanding jobs he could do. (Tr. 88-92.) Mr. Almes sought a hearing before an Administrative Law Judge ("ALJ") which was held by the Honorable Douglas W. Abruzzo on February 20, 2007.[1] On March 12, 2007, Judge Abruzzo issued his decision, again denying benefits inasmuch as he found Plaintiff could perform a limited range of heavy work despite his impairments. (Tr. 13-22.) The Social Security Appeals Council declined to review the ALJ's decision on October 8, 2008, finding

---

[1] An earlier hearing was held on November 7, 2006. (Tr. 27.) Although the transcript of that hearing is not included in the record, according to statements made by Judge Abruzzo on February 20, 2007, the hearing was continued in order for Mr. Almes to retain counsel. (Tr. 39, 30.)

3

no reason pursuant to its rules to do so. (Tr. 6-9.) Therefore, the March 12, 2007 opinion became the final decision of the Commissioner for purposes of review. 42 U.S.C. § 405(h); Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005), citing Sims v. Apfel, 530 U.S. 103, 107 (2000). Plaintiff filed suit in this Court on December 5, 2008, seeking judicial review of that decision.

## C. Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the plaintiff resides.

## III. STANDARD OF REVIEW

The scope of review by this Court is limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Findings of fact by the Commissioner are considered conclusive if they are supported by "substantial evidence," a standard which has been described as requiring more than a "mere scintilla" of evidence,

4

that is, equivalent to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, id. at 401. "A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve a conflict, created by countervailing evidence." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake *de novo* review of the decision and does not re-weigh the evidence presented to the Commissioner. Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006), *citing* Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986) (the substantial evidence standard is deferential, including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.) If the decision is supported by substantial evidence, the Court must affirm the decision, even if the record contains evidence which would support a contrary conclusion. Panetis v. Barnhart, CA No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), *citing* Simmonds v. Heckler, 807 F.2d 54, 58 (3rd Cir. 1986), and Sykes v. Apfel, 228 F.3d 259, 262 (3rd Cir. 2000).

## IV.  **LEGAL ANALYSIS**

### A.  The ALJ's Determination

In determining whether a claimant is eligible for a period of disability and to receive disability insurance benefits, the burden is on the claimant to show that he has a medically

5

determinable physical or mental impairment (or combination of such impairments) which is so severe he is unable to pursue substantial gainful employment[2] currently existing in the national economy. The impairment must be one which is expected to result in death or to have lasted or be expected to last not less than twelve months. 42 U.S.C. § 1382c(a)(3)(C)(i); Morales v. Apfel, 225 F.3d 310, 315-316 (3d Cir. 2000). A claimant seeking DIB must also show that he contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he was last insured. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a). The Commissioner does not dispute that Mr. Almes satisfied the first two non-medical requirements, and the parties do not dispute the ALJ's finding that Plaintiff's date last insured will be December 31, 2009.

To determine a claimant's rights to DIB,[3] the ALJ conducts a formal five-step evaluation:

(1) if the claimant is working or doing substantial gainful activity, he cannot be considered disabled;

(2) if the claimant does not suffer from a severe impairment or combination of impairments that significantly limits his ability to do basic work activity, he is not disabled;

---

[2] According to 20 C.F.R. § 404.1572, substantial employment is defined as "work activity that involves doing significant physical or mental activities." "Gainful work activity" is the kind of work activity usually done for pay or profit.

[3] The same test is used to determine disability for purposes of receiving either DIB or supplemental security income benefits. Burns v. Barnhart, 312 F.3d 113, 119, n.1 (3d Cir. 2002). Therefore, courts routinely consider case law developed under both programs.

(3)   if the claimant does suffer from a severe impairment
      which meets or equals criteria for an impairment listed
      in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the
      Listings") and the condition has lasted or is expected to
      last continually for at least twelve months, the claimant
      is considered disabled;

(4)   if the claimant retains sufficient residual functional
      capacity ("RFC")[4] to perform his past relevant work, he
      is not disabled; and

(5)   if, taking into account the claimant's RFC, age,
      education, and past work experience, the claimant can
      perform other work that exists in the local, regional or
      national economy, he is not disabled.

20 C.F.R. § 404.1520(a)(4); *see also* Morales, 225 F.3d at 316.

In steps one, two, and four, the burden is on the claimant to
present evidence to support his position that he is entitled to
Social Security benefits, while in the fifth step the burden shifts
to the Commissioner to show that the claimant is capable of
performing work which is available in the national economy.[5] Sykes
v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000).

Following the prescribed analysis, Judge Abruzzo noted at step
one that Mr. Almes had attempted to work for two companies after he
quit his job with the Pennsylvania Department of Public Welfare.
The ALJ concluded these were unsuccessful work attempts and,

---

[4]   Briefly stated, residual functional capacity is the most a
claimant can do despite his recognized limitations. Social Security
Ruling 96-9p defines RFC as "the individual's maximum remaining
ability to perform work on a regular and continuing basis, i.e., 8
hours a day, for 5 days a week, or an equivalent work schedule."

[5]   Step three involves a conclusive presumption based on the
listings, therefore, neither party bears the burden of proof at that
stage. Sykes, 228 F.3d at 263, n.2, *citing* Bowen v. Yuckert, 482 U.S.
137, 146-147 n.5 (1987).

7

consequently, Plaintiff had not engaged in substantial gainful activity since his alleged disability onset date of January 7, 2004. (Tr. 15.) Resolving step two in Plaintiff's favor, the ALJ concluded Mr. Almes suffered from obesity, irritable bowel syndrome, major depressive disorder, and generalized anxiety disorder, all of which were "severe"[6] as that term is defined by the Social Security Administration. Although the medical record showed that Plaintiff had also been diagnosed with diabetes mellitus, Judge Abruzzo concluded that this condition was not severe.[7] (Id.)

At step three, the ALJ concluded Plaintiff's IBS had not resulted in significant weight loss, anemia, systemic complications or obstructions as required by Listing 5.00, digestive system, nor had his mental impairments resulted in any "marked" or "extreme" limitations of functioning as required by Listing 12.00. Noting there was no specific Listing for obesity, he concluded

---

[6] See 20 C.F.R. §§ 404.1520(c), 404.1521(a), and 140.1521(b), stating that an impairment is severe only if it significantly limits the claimant's "physical ability to do basic work activities," i.e., "abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling," as compared to "a slight abnormality" which has such a minimal effect that it would not be expected to interfere with the claimant's ability to work, regardless of his age, education, or work experience. Yuckert, 482 U.S. at 149-151. The claimant has the burden of showing that the impairment is severe. Id. at 146, n.5.

[7] At no point in his decision does the ALJ discuss the fact that Plaintiff was diagnosed as early as December 2005 with paranoid schizophrenia. (Tr. 258.)

8

nevertheless that Plaintiff's obesity, considered in combination
with any other impairment, did not satisfy any of the Listings.
(Tr. 16.)

The ALJ concluded at step four that Mr. Almes

does not have any exertional limitations. He retains the
ability to perform work that permits brief access to a
restroom every two to two and one half hours during the
work day and can be performed while wearing an
incontinence protection pad; and is limited to simple,
routine tasks and no more than simple work related
decisions.

(Tr. 16.)

At the hearing, Mark Heckman, a vocational expert ("VE"), had
testified that Plaintiff's previous work as a caseworker was a
skilled, sedentary-level job. (Tr. 20, *see also* Tr. 75.) However,
the ALJ concluded Plaintiff could not return to his past relevant
work due to his non-exertional impairments which limited him to no
more than simple, routine tasks. In addition, he found Plaintiff
did not have any skills which could be transferred to other types
of work within his residual functional capacity. (Tr. 20-21.) Mr.
Heckman further testified, in response to the ALJ's hypothetical
questions, that Plaintiff could perform the representative
occupations of a janitor/cleaner or assembler (each considered
heavy, unskilled work), stock/inventory clerk or private cleaner
(medium, unskilled), and router/sorter or information clerk (light,
unskilled.)   (Tr. 21-22, *see also* Tr. 77-79.)   Accordingly,

9

considering the Plaintiff's age,[8] education, work experience, and residual functional capacity, the ALJ determined at step five that Mr. Almes was not disabled at any time between January 7, 2004, and the date of his decision. Consequently Plaintiff was not entitled to benefits during that period. (Tr. 22.)

B.    Medical Evidence of Record

Although in his application for disability benefits, Plaintiff alleged that his inability to work arose from a combination of impairments, in the brief in support of his motion for summary judgment (Doc. No. 7), Mr. Almes primarily concentrates on the ALJ's reasoning with regard to his mental impairments; the Court will do the same. We begin our review with a summary of the relevant medical records.

1. *Dr. Eric Heasley:* As noted above, Dr. Heasley began treating Plaintiff in January 2003 following removal of three polyps from his bowel. Until early August 2003, Dr. Heasley concentrated on treating Mr. Almes's irritable bowel symptoms which were minimal at that point. (Tr. 185.) In August 2003, Plaintiff told Dr. Heasley that he was excessively tired, had an increased appetite, and some numbness in his hands and feet. His

---

[8]  Plaintiff was 55 on his alleged disability onset date and 58 at the time of the hearing, making him a person of "advanced age." 20 C.F.R. § 404.1563.

10

psychotherapist at the time, Michael R. Monticue,[9] had suggested that he be evaluated for depression and be on "some form of medication." Dr. Heasley diagnosed Plaintiff with fatigue, depression, and anxiety and prescribed Lexapro.[10] (Tr. 184.) At a follow-up appointment in September, Mr. Almes reported that Lexapro had not "made much of a change," and that he had found himself "doing things he wasn't doing before." (Tr. 183.) On October 24, 2003, Dr. Heasley noted that Plaintiff "[p]resents acutely today. He's been extremely agitated over the last few days, [unable] to sleep, very irritable and aggressive at home. Off work the last 3 days trying to calm down. . . . He's cutting down on his drinking as well as his smoking." (Tr. 182.) Dr. Heasley questioned whether these were symptoms of bipolar disorder and prescribed Zyprexa.[11] He further noted he had "strongly suggested" Mr. Almes see a local psychiatrist and that Plaintiff

___

[9] Mr. Monticue's name is spelled in a variety of ways in the record; the Court has used the spelling which appears on the only document prepared by Mr. Monticue himself at Tr. 224-230.

[10] Lexapro (escitalopram) is used to treat depression and generalized anxiety disorder. It is one of a class of antidepressants called selective serotonin reuptake inhibitors ("SSRIs") which work by increasing the amount of serotonin, a natural substance in the brain that helps maintain mental balance. *See* drugs and supplements information at the National Institute of Medicine's on-line website, Medline Plus, www.nlm.nih.gov/medlineplus (last visited May 13, 2009), "Medline Plus."

[11] Zyprexa (olanzapine) is used to treat the symptoms of schizophrenia and bipolar disorder (manic depressive disorder.) Olanzapine is in a class of medications called atypical anti-psychotics. It works by changing the activity of certain natural substances in the brain. See drugs and supplements information at Medline Plus.

11

was "going to try to contact one in the near future." (Id.)  A few days later, on October 31, Plaintiff reported he was feeling significantly improved, with no further evidence of agitation, and was sleeping well. (Tr. 181.)

Throughout 2004, Dr. Heasley continued to treat Plaintiff for episodes of explosive diarrhea associated with his IBS and for arthritis in his hands. (Tr. 176-179.)  By February 21, 2005, Dr. Heasley noted that with regular psychotherapy and medication, Plaintiff's major depression was stable. (Tr. 175.)  However, in June 2005, he noted Plaintiff's "mood is continuing to be a problem. . . .Feels he is sleeping too much."   Dr. Heasley commented that Plaintiff's major depression at that point was "currently not well controlled." (Tr. 300.)  In October 2005, Mr. Almes reported feeling somewhat depressed about not being able to find work. (Tr. 299.)

In January 2006, as discussed in more detail below, Plaintiff was admitted to the Behavioral Health Sciences Unit at Indiana Regional Medical Center for six days. At an appointment in April 2006, Dr. Heasley noted Plaintiff's mood had stabilized and he was "otherwise doing well." (Tr. 298.)  In July and again in November 2006, his mood was described as stable and his depression as "much improved." (Tr. 295-296.)

12

2. *Neuropsychiatric Associates – Dr. Kelleher:*[12] As noted above, in October 2003, Dr. Heasley recommended that Plaintiff consult with a psychiatrist. Dr. Daniel Kelleher performed a psychiatric evaluation on December 10, 2003, noting that Plaintiff presented with a history of major depression. At that point, Mr. Almes was still working although "things [had] not been going well" and he reported increased difficulty in completing his case load. His employer had sent him to a rehabilitation program, and he was also seeing his psychotherapist, Mr. Monticue, on a weekly basis. Plaintiff reported to Dr. Kelleher that he had experienced one episode in which he "felt he was numb, tingling, seeing things and didn't know what was going on." He had no previous psychiatric hospitalizations, was not drinking alcohol at the time, and there was no family history of depression or bipolar disorder. Dr. Kelleher described Mr. Almes as

> verbal, cooperative and pleasant. . . .He related well, with some evidence of depression. Speech is relevant and coherent. There are no auditory or visual hallucinations. He is positive for major depression with sadness, withdrawal, preoccupation, overeating, not able to concentrate or focus, no suicidal or homicidal ideation. He is oriented x 3 with good short and long term memory, insight and judgement [sic] are good.

(Tr. 210.)

Dr. Kelleher's initial diagnosis was major depression and he

---

[12] Although the medical records from Neuropsychiatric Associates are all attributed to Dr. Gelfand, Plaintiff actually consulted with Dr. Kelleher from December 2003 until April 2004.

13

rated Plaintiff's Global Assessment of Functioning score ("GAF") at 24.[13] (Tr. 210-211.)

On January 20, 2004, Plaintiff reported to Dr. Kelleher that he had lost his job and consequently his medical insurance. That, coupled with the fact that one of his daughters had recently been in an automobile accident, had caused him to be "very anxious and tense;" he also continued to be depressed.[14] (Tr. 209.) By April 8, 2004, Plaintiff reported that he was "doing much better" and that the increase in his antidepressant (Lexapro) had helped his focus and concentration.

3. *Neuropsychiatric Associates – Dr. Gelfand:* In May 2004, Plaintiff's treatment changed from Dr. Kelleher to Dr. Steven B. Gelfand, a psychiatrist and neurologist. He reported Plaintiff was feeling more hopeful and less helpless; he was not experiencing overwhelming anxiety. He denied suicidal or homicidal thoughts and

---

[13] The GAF scale assesses how well an individual can function according to psychological, social, and occupational parameters, with the lowest scores assigned to individuals who are unable care for themselves. Drejka v. Barnhart, CA No. 01-587, 2002 U.S. Dist. LEXIS 7802, *5, n2 (D. Del. Apr. 18, 2002). A GAF score between 21 and 30 reflects behavior which "is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends.)" *See* the on-line version of DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("On-line DSM-IV"), Multiaxial Assessment, American Psychiatric Association (2002), at www.lexis.com., last visited May 12, 2009.

[14] Dr. Kelleher further noted that Plaintiff had recently been evaluated at the "Guidance Center" by Ronald Seine (Tr. 209), but no records from this evaluation appear in the record.

14

recent panic attacks. Dr. Gelfand noted Mr. Almes "has not been taking Zyprexa regularly because he was paying out-of-pocket for the medicines. He recently has gotten prescription benefits. Once he is on the medications consistently, we can more appropriately evaluate his moods and make medication changes if needed." (Tr. 207.)

During the period June through September 2004, Plaintiff responded positively to his medication although he continued to have a depressed mood with anhedonia and fatigue. Dr. Gelfand replaced Zyprexa with Abilify[15] in July, and by September, his mentation was described as "actually pretty good," his mood and cognitive functions were stable and his thought process was within normal limits. He was sleeping well at night and did not complain of hallucinations, delusions, panic attacks, manias, obsessions, or phobias. He was continuing to have intermittent problems with his bowels, which Dr. Gelfand believed was "at least partially psychogenic." (Tr. 204-206.)

In November 2004, Plaintiff suffered a set back when his

---

[15] Abilify (aripiprazole) is used to treat the symptoms of schizophrenia and, in combination with other medications, to treat episodes of mania and bipolar disorder. Aripiprazole is also used with an antidepressant to treat depression when symptoms cannot be controlled by the antidepressant alone. Like Zyprexa, Abilify is an atypical anti-psychotic. *See* drugs and supplements information at Medline Plus.

"antisocial" daughter moved into his home.[16] Dr. Gelfand stated Mr. Almes "does not have [the] psychiatric and psychological wherewithal to cope with this, as he suffers from a psychotic depression." Plaintiff reported three episodes in the previous six weeks in which he felt "he would be better off if he was dead," suicidal thoughts he had not expressed "in quite some time." Dr. Gelfand believed that once Mr. Almes's daughter was "out of the picture, he should do well." (Tr. 203.) However, in January 2005, the daughter was still in his home. Dr. Gelfand reported Plaintiff was "not able to return to work yet, as his concentration and attention have not improved." His depression was considered "relatively well controlled." Plaintiff's diagnosis at that point was "depression chronic, recurrent, fed by his living situation, which is difficult at best." (Tr. 202.)

In February and April 2005, Plaintiff's depression and history of psychosis were described as stable with the combination of Abilify and Lexapro. He reported his mood was somewhat better and that he was looking for a part-time job, despite continued anhedonia. (Tr. 201; 261.) In July 2005, Dr. Gelfand noted that Plaintiff was "[n]ot involved in any activities. He worked his entire life and had no hobbies and no activities outside of work - now that he is not working, he continues this pattern. Does not

---

[16] Mr. Almes has two daughters; the younger daughter is the one who appears from the record to have serious social problems; the older seems to have been the family member who alerted mental health services to Plaintiff's deteriorating mental state in late 2005.

16

give him a reason most days to get out of bed before lunchtime."
(Tr. 260.) In October, Mr. Almes was still unable to find work and
noted that some days he did not feel motivated to get out of bed.
However, he did not feel he was "overly depressed." (Tr. 259.)

On December 29, 2005, Dr. Gelfand noted:

We had a call from mental health, indicating that he is
still living in deplorable conditions, made worse by the
fact that his 22-year-old daughter who has extraordinary
issues, has moved back in with him. The plan at this
point is to arrange for an admission. . . .If he
continues to be unable to control his situation, being
psychotic episodically, at that point, we will readmit
him. He is reporting some irritability, inability to
sleep and ongoing difficulties with controlling his
mentation. He is also living in filth. . . . We can
either . . .[commit him involuntarily] today or have him
sign himself in on Monday. He is aware of that and
acceptable of the circumstances.

(Tr. 258.) Dr. Gelfand's diagnosis at that time was paranoid
schizophrenia with acute exacerbation.

On January 4, 2006, Plaintiff was admitted to the Behavioral
Health Services Unit. (Tr. 282-294.) On admission, Dr. Gelfand
commented that Plaintiff had a history of severe depression, and
had recently deteriorated to the point of living in "in filth" and
that his house had become "infested with vermin." (Tr. 282.) It
was further noted he had reported suicidal thoughts, decrease in
activities of daily living, poor hygiene, decreased interests, and
decreased appetite with weight loss. (Tr. 285.) His affect was
flat, mood depressed, and thoughts "somewhat organized." He had
"some passive suicidal ideations," and his GAF on admission was

20.[17] (Tr. 291-292.) During his six-day hospitalization, Plaintiff received individualized psychotherapy and attended group therapy "with minimal participation" and minimal socialization. His activities of daily living remained poor, despite "much cuing." (Tr. 285.) On discharge, "significant improvements" in his overall mood were noted; his affect was "full range and appropriate," and he had no hallucinations, delusions, mania, loose associations, or flight of ideas. However, he continued to experience some hopelessness and helplessness, and his judgment and insight were considered only fair. On discharge to his daughter's home on January 10, 2006, his diagnosis was major depression, recurrent, and his GAF was in the range of 45-50, indicative of serious psychological symptoms or serious impairment in social or occupational functioning. (Tr. 257; *see also* On-line DSM-IV.)

In February 2006, Plaintiff moved into an apartment.[18] His family had thrown away all of his personal belongings as part of the move, and while he admitted his home was previously "in shambles," he found the move upsetting. At this time, however,

---

[17] A GAF between 11 and 20 reflects "[s]ome danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute.)" *See* On-line DSM-IV.

[18] According to a report completed in July 2006, Plaintiff's house had been deemed "unfit for habitation" and condemned during his hospitalization. His family then helped him move into an apartment. (Tr. 148-149.)

18

Plaintiff was no longer staying in bed during the day, his energy and hygiene had improved, and he was meeting regularly with his psychotherapist. (Tr. 253-254.) By March 2006, Dr. Gelfand described Plaintiff as "completely without symptoms at this time." His thinking was clear, he was not irritable nor experiencing sleep, appetite or mood disturbances. His diagnosis at the time was "depression with psychosis – controlled." (Tr. 252.) In June Mr. Almes reported he was doing two volunteer jobs and discussed the possibility of looking for part-time employment. The doctor suggested it would be "reasonable to continue the volunteer jobs through the summer and then in September we can evaluate whether or not going to part time employment is reasonable." At the time, Dr. Gelfand's diagnosis was chronic undifferentiated schizophrenia, currently stable. (Tr. 305.)

By September 2006, Mr. Almes was once reporting an increase in symptoms, particularly worsening depression. Dr. Gelfand noted a "lot of ruminating," and that while there were no overt psychotic issues, Plaintiff appeared to be more distracted than usual. His judgment and insight were described as fair and his affect as "a bit more constricted than usual." Mr. Almes had not seen a therapist for some time but Dr. Gelfand commented he would get him an appointment with one "posthaste."[19] He noted Plaintiff was not

---

[19] The record is unclear about Mr. Almes's psychotherapist at this point in time. He had previously been treated by Mr. Monticue, but between June and July 2006, Dr. Mary Lou Mlecko, also of Neuropsychiatric Associates, provided therapy. (Tr. 304, [continued]

demonstrating the irritability, hallucinations or extreme obsessiveness which were associated with his more severe periods. The diagnosis at that time was chronic undifferentiated schizophrenia with superimposed depression. (Tr. 304.)

On October 3, 2006, Dr. Gelfand noted that Plaintiff was "involved in a number of clubs," and did not go to bed until 4 a.m., then slept until 3 p.m. He had not been psychotic or agitated, had no hallucinations or delusions, and seemed to be taking better care of his personal hygiene. He reported to Dr. Gelfand that he was "taking good care of his apartment" and the doctor had received no calls from his family stating Plaintiff was not taking his medications or meeting his own needs. His affect was bright and he was interactive. Dr. Gelfand modified his dosage of Abilify so he would not sleep so much. (Tr. 303.)

In November, Mr. Almes reported to Dr. Gelfand that he had been staying in bed more often and was neglecting a lot of his housework; he appeared to be somewhat more depressed, and Dr. Gelfand increased his dosage of Provigil.[20] (Tr. 302.) This caused "some dizzy episodes," which Mr. Almes reported a month later on

210, 148.) None of her notes appear in the record and unlike Mr. Monticue, the Social Security Administration apparently did not ask her to complete any evaluation forms.

[20] Among other uses, Provigil (modafinil) is used to treat excessive sleepiness. It is one of a class of medications called wakefulness promoting agents which change the amounts of certain natural substances in the area of the brain that controls sleep and wakefulness. *See* drugs and supplements information at Medline Plus.

December 14, 2006. Dr. Gelfand also noted that Mr. Almes

> feels that the biggest holdup to his ability to function
> normally is his bowel issues. He has episodes of
> explosive diarrhea and is quite unpredictable. On
> today's visit he had to excuse himself several times to
> the rest room and he was quite odoriferous.

(Tr. 301.) However, he noted Plaintiff had been sleeping properly

and his appetite was stable. Mr. Almes denied hopelessness,

helplessness, irritability, or any psychotic episodes. (Id.)

4. *Michael Monticue:* Apparently at the request of the

Social Security Administration, Plaintiff's long-term therapist,

Michael Monticue, completed a form document summarizing his

treatment for the period December 30, 2003, through April 8, 2005.[21]

(Tr. 224-223.) Mr. Monticue, a licensed social worker, noted a

diagnosis of generalized anxiety, rule out depression. Of

particular note, he commented that while Mr. Almes continued to

exhibit anxious behavior, his anxiety had been greatly reduced with

medication. He often presented with a depressed mood, and

expressed feelings of helplessness and hopelessness. He did not

report hallucinations or illusions, de-personalization or de-

realization, and his thought pattern was described as stable and

intact. He did, however, exhibit excessive worry that interfered

with his activities of daily living and with his concentration. At

times, he reported "having excessive thoughts that could sometimes

---

[21] It is unclear why Mr. Monticue refers to treating Plaintiff
only from December 30, 2003 when Dr. Heasley's notes refer to him as
Plaintiff's therapist at least as early as August 2003. (Tr. 184.)

affect impulses," but his social judgment, test judgment and insight were good. He did not report panic attacks that significantly affected his life. Although Mr. Monticue reported Mr. Almes did not demonstrate difficulty performing daily activities on a sustained basis, he did report co-dependent behaviors with his family which affected his ability to interact appropriately with others at times. His anxiety affected his motivation to be productive for short periods of time.

Mr. Monticue also completed a form entitled "Medical Source Statement of Ability to Do Work-Related Activities (Mental)" in which he stated that Mr. Almes's ability to understand, remember and carry out either short/simple or detailed instructions was not affected by his impairments. He further noted Plaintiff's ability to interact appropriately with the public was unaffected, but he would have slight difficulties interacting appropriately with supervisors and co-workers and responding appropriately to changes in a routine work setting. He would also have moderate difficulty responding appropriately to work pressures due to his past bouts with generalized anxiety. (Tr. 229-230.)

    5.  *Dr. Robert L. Davoli:* Although Plaintiff did not undergo a consultative psychiatric evaluation, Dr. Robert L. Davoli, a physician who provided a general examination on May 26, 2005, commented briefly about Plaintiff's mental condition. He noted Plaintiff's complaints of depression, the fact that he was

22

seeing Dr. Gelfand regularly, and was on a number of medications for depression. Dr. Davoli also opined that Plaintiff's irritable bowel syndrome and related symptoms "tied in with his depression and anxiety." On physical examination, he commented that Plaintiff's "affect is noticeably flat," but he was pleasant, appropriate, and oriented to person, place and time. Along with his physical diagnoses, Dr. Davoli noted a "history of mental illness" which he suspected was bipolar disorder. (Tr. 231-234.)

6. *State Agency Evaluation:* On June 29, 2005, Golin Sanford, Ph.D., completed a "Mental Residual Functional Capacity Assessment," along with a "Psychiatric Review Technique Form." Based on his file review, Dr. Sanford concluded that with a few exceptions, Plaintiff was not significantly limited in any aspects of his understanding and memory, ability to sustain concentration and persistence, ability to interact socially in an appropriate manner, and adapt to changes in work and public settings. The exceptions included moderate limitations in his ability to concentrate for extended periods of time; complete a normal workday and workweek without interruptions from psychologically based symptoms; accept instructions and respond appropriately to a supervisor's criticisms; get along with co-workers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; or set realistic goals or make plans independently of others. Overall, Dr. Sanford

23

concluded that Mr. Almes would be "able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his impairments." (Tr. 235-237.) He recognized Plaintiff's diagnoses of major depressive disorder and anxiety related disorder, but concluded Plaintiff had only mild restrictions in his activities of daily living and moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace. He specifically noted Dr. Gelfand's comment dated February 21, 2005, that Plaintiff's major depressive disorder and generalized anxiety disorder were "improved on meds" and Dr. Heasley's comment of the same date that Plaintiff's major depressive disorder was "stable." (Tr. 238-250.)

C.    The ALJ's Treatment of the Medical Record

Although Plaintiff raises several arguments in his brief, we need not address them all because we agree that the ALJ's failure to undertake a fair and impartial review of this case precluded a decision based on substantial evidence. We cite a few examples of his mischaracterizations, omissions, and unfounded speculation.

At one point in his analysis, the ALJ stated:

The claimant has a history of alcohol abuse (Exhibit 11F.) When he was initially evaluated in August 2003, Dr. Heasley noted that some of his symptoms could be attributed to either seratonic [sic] syndrome or alcohol withdrawal. . . . Although the claimant states that he no longer drinks, he was spending every day at a bar, as of April 2005.

24

(Tr. 18.)

There is a single reference to alcohol use in Exhibit 11F, the hospital records from Mr. Almes's in-patient treatment in January 2006. (Tr. 282-294.) It was reported, evidently by social workers who had investigated his family's concerns about Plaintiff's living conditions, that "he had a history of drinking heavily although he denies any alcohol use in the last several years," a condition which Dr. Gelfand described as "a reported history of ethanol abuse in the past." (Tr. 291.) He was not treated for or diagnosed with any disorders related to alcohol abuse. There are no other references to alcohol abuse in the medical records of Dr. Gelfand or Dr. Kelleher, other than indications that he was no longer drinking and that he "admitted to alcohol use." (Tr 293.) Of more concern is the fact that the ALJ's reference to Dr. Heasley's notes from August 2003 is patently incorrect. As noted above, Plaintiff had been prescribed Lexapro in August 2003, but did not experience much improvement. (Tr. 183-184.) In October, Dr. Heasley indicated Mr. Almes had been "extremely agitated" for the last few days and was unable to sleep, very irritable and aggressive at home. Rather than attributing these symptoms to "seratonic" syndrome or alcohol withdrawal as the ALJ concluded, Dr. Heasley actually wrote: "I **cannot** appreciate this as a serotonin syndrome²²

---

²² Serotonin syndrome is a potentially life-threatening drug reaction that results from drugs which cause too much serotonin to be released or to remain in the brain. It is most likely to occur when a patient first starts or increases the dosage of an SSRI such as

25

or alcohol withdrawal." (Tr. 182, emphasis added.) After his medications were changed, a week later, Plaintiff described his condition as "significantly improved." (Tr. 181.) As for the comment by the ALJ that although Plaintiff stated that he did not drink alcohol at present, "he was spending every day at a bar, as of April 2005," that statement does not acknowledge that Plaintiff actually wrote that on a daily basis, he would "sit at bar (drinking Diet Coke) and [talk] with friends." (Tr. 134.)

On another subject, the ALJ commented:

> Dr. Gelfand specifically notes that the claimant's depression is fed by his living situation, particularly during periods of time when he is living with a daughter who appears to have psychiatric problems of her own. . . . His episodes of psychosis and admission for inpatient treatment occurred shortly after his daughter moved back into his household. When the claimant was able to move into his own apartment, his level of functioning significantly improved.

(Tr. 19).

A review of the record shows that Plaintiff experienced severe depression and at least one possible psychotic episode when he felt "numb, tingling, seeing things and didn't know what was going on" as early as December 2003. (Tr. 210.) His condition improved during the spring and summer of 2004 until his problematic daughter moved into his home sometime around November 2004. (Tr. 203.) Although his daughter continued to live with him until at least December 2005, Plaintiff experienced an improvement in his mental

Lexapro. *See* medical encyclopedia at Medline Plus.

condition during the summer and early autumn of that year. (Tr. 201-202; 259-261.) However, his admission to the hospital did not, as the ALJ indicated occur "shortly after his daughter moved back into his household," but more than a year later, that is, in January 2006. Nor is it precisely true that when Mr. Almes moved into his own apartment, "his level of functioning significantly improved." Although there is evidence that his condition improved from February until June 2006, between September and November 2006 – while still living in his apartment alone – his condition again deteriorated despite medication and therapy. (Tr. 301-304.)

Most disturbing, in his decision, the ALJ wrote:

> The claimant testified that he has not always been honest with Dr. Gelfand. When the undersigned inquired how he could be assured the claimant was being honest at the hearing, claimant responded that he was under oath at the hearing, but not when talking to Dr. Gelfand. . . . The [ALJ] finds this admission troubling and notes that the claimant was not under oath when he was examined by any other physician either. One would expect the claimant to be most honest with his treating psychiatrist if he were suffering mental/emotional distress and desired to be treated and become well. Claimant's willingness to distort the facts to his treatment sources suggests that he may be trying to manipulate the system to his personal advantage. At least, it establishes that his truthfulness cannot be taken [at] face value.

(Tr. 19.)

At the hearing, the ALJ commented on Dr. Gelfand's notes from June 2006 in which he referred to Plaintiff's report that he was doing two volunteer jobs[23] and broached the possibility of returning

---

[23] At the hearing, Plaintiff explained that these jobs involved "working" bingo games at his social clubs. (Tr. 76.)

27

to work.  He stated to Mr. Almes:

> ALJ:  .  .  .  According to [Dr. Gelfand], he says he told you
> just to continue the volunteer jobs through the summer
> and then in September you can look at what the picture is
> for part-time employment.  Does that sound familiar?
>
> Plf: Yes, sir.
>
> ALJ: Okay, amazingly enough in September there was a marked
> increase in symptoms.  Okay, I guess you told him in
> October that you were taking good care of the apartment.
>
> Plf: I told him in October, I believe, that I was trying to
> catch up on my stuff that I had not done in the
> apartment, but I didn't get very far on that.
>
> ALJ: Okay, so you didn't tell him the truth then or —
>
> Plf: No.
>
> ALJ: Then if you won't tell your treating psychiatrist the
> truth, then how do I know you're telling me the truth
> today?
>
> Plf: I've taken an oath today.  I haven't taken it for the
> psychiatrist.
>
> ALJ: Okay.

(Tr. 76.)

An earlier exchange between Plaintiff and his attorney concerning conditions in his apartment elicited the testimony on which the ALJ apparently relied in reaching his conclusion that Mr. Almes had not always been truthful with Dr. Gelfand (and, by extension, his other "treatment sources.")  After Plaintiff testified that living conditions in his apartment had deteriorated (i.e., a sink-ful of dirty dishes, lack of dusting or cleaning since he moved in, his bed covered with dirty clothes), his

28

attorney asked:

    Att: Have you talked to Dr. Gelfand recently about those
         things?

    Plf: No, I haven't.

    Att: Why not?

    Plf: Because I'm afraid he'll put me back in the hospital.
(Tr. 69-70.)

    Moreover, the ALJ failed to recognize that after the October
report in which Dr. Gelfand noted Plaintiff's statements that "[h]e
seems to be taking better care of his personal hygiene [and]
reports he is taking good care of his apartment" (Tr. 303), at the
next appointment on November 14, 2006, Plaintiff reported that he
had been "neglecting a lot of his housework." (Tr. 302.)   Since
it is clear from Dr. Gelfand's notes from December 2005 through
November 2006 that he considered deterioration of personal hygiene
and home maintenance as signs of increased depression and
psychosis, it would seem Plaintiff's reluctance to tell Dr. Gelfand
about these problems was understandable.   In addition, the ALJ's
reasoning with regard to Plaintiff's alleged distortion of facts to
his treating sources in order to manipulate the system to his
advantage is illogical.   If Mr. Almes told his psychiatrist he was
taking good care of his apartment, that would imply his mental
condition was improving, not becoming worse.   Such distortions
would not be to his advantage if he were trying to manipulate the
system in order to receive benefits.

We note two final inconsistencies between the record and the ALJ's description thereof. First, in discussing episodes of deterioration or decompensation, the ALJ noted "there is no evidence of suicidal ideation, homicidal ideation, delusions, [mania] or phobias." (Tr. 18.) To the contrary, Plaintiff discussed suicidal thoughts with Dr. Gelfand in November 2004 (Tr. 203), with the implication that he had expressed similar feelings at some time in the past, and again when he was admitted to the hospital in January 2006. (Tr. 291.) Second, the ALJ commented, "Some of the claimant's low periods of functioning are attributed to the fact that he was not always able to afford his medications, and was, therefore, not always adequately medicated." (Tr. 19.) In the 40-month period between August 2003 and December 2006, there is one mention of Plaintiff not being able to afford his medication which occurred shortly after he lost his job and his medical insurance coverage. There is no mention of other periods when he was "not always adequately medicated" and the record shows multiple instances in which his depression and anxiety increased although he was prescribed numerous medications and presumably was taking them since there are no indications to the contrary in the record.

On a related subject, we note that at no point in his decision does the ALJ explain the weight he gave to the medical opinions of Drs. Heasley, Kelleher and Gelfand. He gave "some weight" to Mr. Monticue's opinion of April 2005 (Tr. 19) and to Dr. Sanford's

report, also dated April 2005 (Tr. 20), but no indication of the
weight given to the opinions of Plaintiff's long-term treating
physicians and psychiatrists. He did indicate that he gave "little
weight" to a disability report purportedly signed by Dr. Heasley in
January 2004[24] because "the report was clearly filled out to

---

[24] From the context, this report and a comparable one completed
by Dr. Kelleher seem to be employability forms for the Commonwealth of
Pennsylvania Bureau of Disability; however, neither report appears in
the record and Dr. Kelleher's notes do not refer to completing such a
form other than a comment from April 2004 that Mr. Almes was "applying
to the State for disability." (Tr. 208.)  We also find that the ALJ
has again somewhat distorted this description of Dr. Heasley's notes
on the subject.  The ALJ wrote:

"Although, in January 2004, Dr. Heasley signed a report that
the claimant was unable to work. . . , little weight is
afforded to that opinion because the report was clearly
filled out to accommodate the claimant and was based on his
statements alone.  Dr. Heasley clearly states that, as of
the last time he examined the claimant, he was doing well.
The fact that the claimant lost his job was a significant
factor in Dr. Heasley's decision to sign the form.  However,
Dr. Heasley had nothing but the claimant's report upon which
to base his assessment. (Tr. 19.)

Dr. Heasley actually wrote:

"He lost his job.  He's been unable to perform his duties
appropriately.  I saw him at the end of October, feeling
completely well following the addition of Zyprexa.  I
received a [disability] form the beginning of [December.]  I
had not seen the patient or contact [sic] him since that
period of time.  I filled it out for his employment
indicating that he was able to work.  He brings this [i.e.,
another state disability form] in today and says he cannot
work.  Indicated at that point in time, I had no other
information and at my last visit he was feeling quite well
and able to perform duties.  It was filled out in that
fashion.  I will fill it out in another fashion.  At this
point in time, he is unable to perform his duties, claiming
due to psychiatric disease." (Tr. 180.)

At the beginning of December 2003, Plaintiff was still working,
although he reported to Dr. Kelleher that he was having difficulty
completing his caseload and had been accused of falsifying records.
(Tr. 210.)  That is, as Dr. Heasley stated, between October and
December 2003, Plaintiff was able to work and it was appropriate that
Dr. Heasley so indicated on the disability form he prepared at that
time.  It was not until January 2004, after Plaintiff lost his job,
lost his medical insurance, and his daughter was in an vehicle

31

accommodate the claimant and was based on his statements alone."
(Tr. 19.) However, although the records of Drs. Kelleher and
Gelfand are replete with comments about Mr. Almes's ongoing
problems, anhedonia, daytime fatigue, erratic sleep patterns,
thoughts of suicide, feelings of hopelessness, and, most
importantly, deficiencies in activities of daily living,
concentration and focus, and social functioning, the ALJ fails to
explain why he apparently gave these records little or no weight in
arriving at his conclusion that Plaintiff's mental impairments
could be accommodated by limiting him to "simple routine tasks"
which required no more than "simple work related decisions." (Tr.
16.) These limitations can only be based on the opinions of Dr.
Sanford and Mr. Monticue, both of which date from April 2005, long
before Plaintiff's most serious manifestation of his depression in
January 2006. Moreover, neither is the opinion of a long-term
treating physician entitled to significant weight.

     In a recent case decided by the United States Court of Appeals
for the Third Circuit, the Court reiterated its long-standing
position that an ALJ's disability determination is not supported by

_____

accident that he claimed he was unable to work. (See Dr. Kelleher's
notes of January 20, 2004, at Tr. 209.) Therefore, the medical
evidence, as a whole, indicates Plaintiff's mental condition had
deteriorated between October or December 2003 and January 2004. It
was therefore appropriate that Dr. Heasley complete the disability
form "in another fashion," indicating Mr. Almes was not able to work
"due to psychiatric disease." The ALJ does not explain what evidence
Mr. Almes could have presented to Dr. Heasley other than his own
statements about his working situation and his mental condition.

substantial evidence when he fails to give appropriate weight to
the opinion of the claimant's treating physicians and instead
improperly relies on the opinion of a non-examining psychologist.
Brownawell v. Comm'r of Soc. Sec., 554 F.3d 352, 355 (3d Cir.
2008), *citing* Morales, 225 F.3d at 317, and Plummer v. Apfel, 186
F.3d 422, 429 (3d Cir. 1999), for the principles that an ALJ should
give "treating physicians' reports great weight, especially when
their opinions reflect expert judgment based on a continuing
observation of the patient's condition over a prolonged period of
time," and that contradictory medical evidence is required for an
ALJ to reject a treating physician's opinion outright. Here, Drs.
Heasley, Kelleher and Gelfand treated Plaintiff for the period
August 2003 through at least December 2006 and were consistent in
their opinions of Plaintiff's chronic mental conditions;
conversely, none of them ever provided contradictory medical
evidence on which the ALJ could rely in concluding Plaintiff was
able to return to some form of substantial gainful activity.

We are also concerned about the ALJ's reasoning with regard to
Plaintiff's credibility, in particular his conclusion that Mr.
Almes's "willingness to distort the facts" suggested he was trying
to manipulate the system or established that "his truthfulness
cannot be taken [at] face value." (Tr. 19.) As discussed above,
we find this conclusion both illogical and based on an incomplete,
erroneous or selective reading of the record and Plaintiff's

33

testimony. In most cases, a district court will give great deference to the ALJ's credibility determination because he or she is best equipped to judge the claimant's demeanor and attitude. *See* Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003). However, the Court must review the factual findings underlying the ALJ's credibility determination to ensure that it is "closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Hackett v. Barnhart, 395 F.3d 1168, 1173 (10th Cir. 2005) (internal quotation omitted.) Here, we find the facts of the case, read objectively, do not support the ALJ's credibility analysis.

## V. **FURTHER PROCEEDINGS**

Under 42 U.S.C. § 405(g), a district court may, at its discretion, affirm, modify or reverse the Secretary's final decision with or without remand for additional hearings. However, the reviewing court may award benefits "only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the plaintiff is disabled and entitled to benefits." Krizon v. Barnhart, 197 F. Supp.2d 279, 291 (W.D. Pa. 2002), *quoting* Podedworney v. Harris, 745 F.2d 210, 222 (3d Cir. 1984).

While Plaintiff's physicians and psychiatrists commented frequently about the symptoms of Plaintiff's mental disorders, none of them opined directly about the effect those conditions might

have on his ability to work.  An unexplained major omission from this record is any examination by a consulting psychiatrist, particularly since the medical record reveals mental conditions which were far more serious than Plaintiff's physical impairments.

We recommend that on remand the ALJ engage such a consultant and incorporate his or her report into his analysis.  We also expect that the ALJ will explain the weight given to the medical records of Plaintiff's long-term treating physicians and the contradictory medical evidence on which he relies if he continues to find Plaintiff is not disabled.

An appropriate order follows.

May __/ 9__, 2009

William L. Standish
United States District Judge